F.R. JOHNSON PRODUCTS COMPANY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent F. R. Johnson Products Co. v. Commissioner
Docket Nos. 2981-76, 4786-76, 17649-79, 17650-79.
United States Tax Court
T.C. Memo 1982-110; 1982 Tax Ct. Memo LEXIS 631; 43 T.C.M. (CCH) 705; T.C.M. (RIA) 82110; March 8, 1982. Neil Strefling,Phillip Nusholtz, and Neal Nusholtz, for the petitioners. Joseph C. Hollywood, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to the tax in these consolidated cases: Docket
Taxable
Sec. 6653(a) [2]
Petitioner
No.
Year
Deficiency
Addition to the Tax
Fred R. Johnson
4786-76
1972
$ 30,032.20
$ 1,501.61
1973
24,803.80
1,240.19
17649-79
1974
48,456.98
2,422.85
1975
22,024.25
1,101.21
Totals
$ 125,317.23
$ 6,265.86
F.R. Johnson
Products
Company
2981-76
1972
$ 24,905.24
$ 1,245.26
1973
19,297.55
964.87
Johnson
Products
Company [3]
17650-79
1974
34,639.47
1,731.97
1975
10,445.05
522.25
Totals
$ 89,287.31
$ 4,464.35
*633 After concessions, the issues for decision are as follows: 1. Whether the income from a hose business for the years 1972 through 1975 is properly taxable to Fred R. Johnson individually or to F.R. Johnson Products Company as a corporation; and 2. Whether certain payments made to F.R. Johnson Insurance Agency, Inc., are deductible under section 162 for the years 1973 through 1975. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, the exhibits attached *634 thereto, and the parties' oral stipulations in the transcript are incorporated herein by this reference. Petitioner in Docket Nos. 4786-76 and 17649-79 is Fred R. Johnson (hereinafter "Johbson"). Johnson was a legal resident of Northville, Michigan, at the times the petitions were filed in these cases. Johnson timely filed individual Federal income tax returns for the years 1972 through 1975, inclusive. He filed Forms 1040A for the years 1972 through 1974 and reported only wages on his W-2 Forms from Johnson Products (Employer No. 38-1792949) in the amounts of $ 9,825, $ 10,400, and $ 10,400, respectively. Johnson filed a Form 1040 for 1975 reflecting wages on his W-2 Form from Johnson Products (Employer No. 38-1792949) in the amount of $ 10,400 and income from a Small Business Corporation (Johnson Products - Employer No. 38-1792949) in the amount of $ 2,060. Petitioner in Docket No. 2981-76, captioned F.R. Johnson Products Company, and in Docket No. 17650-79, captioned Johnson Products Company, is the same entity and will hereinafter be referred to as "Johnson Products." See footnote 3 above. Johnson Products' principal office was located at 23593 Van Born Road, Taylor, *635 Michigan, on the dates the petitions were filed in these cases. Johnson Products timely filed corporate Federal income tax returns, Forms 1120, for the years 1972 through 1975, inclusive. Those returns bore the signature of Fred R. Johnson, the name Johnson Products, and the Employer No. 38-1792949. The 1972 and 1973 returns reflected compensation paid to officers in the same amounts reflected on the individual returns of Fred. R. Johnson. Those returns also stated that Fred R. Johnson owned 75 percent of the corporation's common stock. The 1974 and 1975 returns were silent as to compensation paid to officers or stock ownership. Johnson was graduated from Oregon State College in 1940 with a degree in industrial engineering. After graduation, Johnson worked for Westinghouse Corporation from 1940 until 1949 as a methods engineer and supervisor of methods engineering. During his employment with Westinghouse, Johnson took two years of graduate courses in methods engineering at the University of Kentucky as part of a training program that Westinghouse conducted for its employees, but he did not receive an advanced degree. From 1949 through 1954, Johnson worked for Ford Motor Company, *636 beginning as a cost analyst. While at Ford, Johnson became manager of the Facilities and Standards Department and was responsible for accounting for money spent by that department. Johnson is not a certified professional engineer, but has had many years of experience in the engineering and manufacturing management fields. While employed with Ford, Johnson and another engineer at Ford, Fred H. Cook, formed a partnership on February 5, 1954, called Simplon Products Company. Johnson and Cook formed the partnership in order to develop a central sewer-connected vacuum cleaning system for homes that sucked dirt and liquids directly into the sewer drain and cleaned and shampooed rugs. The system, called the "Easyway Automatic Vacuum System," consisted of a central machine that was installed in the home and a long hose that reached all parts of the home. Shortly thereafter, Johnson and Cook decided to continue their vacuum system business in the corporate form. On July 14, 1954, Johnson and Cook formed Simplon Corporation, caused it to purchase the assets of Simplon Products Company, and capitalized it at $ 50,000. On August 9, 1954, Johnson and Cook incorporated their business *637 by filing Articles of Incorporation for Simplon Corporation with the State of Michigan Department of Commerce. In October of 1954, Johnson and Cook rented an office for the business at 23593 Van Born Road in Taylor, Michigan. During December of 1954, Johnson and Cook resigned from their respective positions at Ford Motor Company and began working full time for Simplon Corporation. The Articles of Incorporation filed for Simplon Corporation provided for the initial issuance of 5,000 shares of common stock with a par value of $ 10 per share to eight shareholders, a board of directors consisting of seven of the initial shareholders, and a term of corporate existence of 30 years. From 1954 through 1956, there were several changes in the capital stock of Simplon Corporation including increases in the number of shares and the issuance of preferred stock. The number of shareholders of Simplon Corporation increased to around 23 by June 1, 1956, and may have been somewhat greater in 1957 and 1958. From 1954 through 1956 and thereafter, Johnson was the largest individual shareholder of Simplon Corporation owning 20 to as much as 25 percent of the outstanding shares. Also during the period *638 1954 through 1956, Johnson served as president, general manager, and a member of the Board of Directors of Simplon Corporation. During the years 1954 through 1956, Simplon Corporation observed the required corporate formalities, including regular meetings of the shareholders and directors, issuance of stock certificates to shareholders of record, payment of all corporate franchise taxes, and filing of all annual reports required by the State of Michigan. Throughout this period, an attorney named John Fitzer represented Simplon Corporation and received Simplon stock in partial payment for his legal services. From 1954 until 1958, Simplon Corporation was engaged exclusively in the development of the Easyway vacuum system. By 1958, problems had developed with the hoses on that system and profits had declined. In 1958, Johnson spent eight months in Philadelphia developing hoses for the Easyway system. Sometime after that trip, however, Johnson stopped working on the vacuum system and devoted all of his time to developing various types of industrial hoses. Around this same time, Johnson's unreasonable and dictatorial business practices, his lack of progress in manufacturing and *639 marketing the vacuum system, his failure to pay any cash dividend to shareholders, and his consistent disregard of the shareholders' advice caused the vast majority of shareholders to abandon their interest in Simplon Corporation and to cease all contact with Simplon and Johnson. During 1956, Simplon Corporation's attorney, John Fitzer, ceased representing the business because of Johnson's unreasonable business practices. After Fitzer stopped representing the business, he had no contact with the business or with Johnson prior to 1970. During the year 1958 or 1959, Fitzer determined that his Simplon Corporation stock was worthless. Accordingly, Fitzer claimed an income tax deduction for that worthless stock on his Federal individual income tax return for one of those years. Another shareholder, William A. Jason, claimed an income tax deduction for the worthlessness of his Simplon Corporation stock after Johnson told him in the spring of 1958 that the business was his own company, was no longer making vacuum systems, and was not making a profit. Sometime around 1958, Johnson's original partner, Fred H. Cook, left Simplon Corporation to go to work for another company. For the *640 years 1957 and thereafter, Simplon Corporation failed to pay the appropriate franchise taxes to and to file the appropriate annual reports with the State of Michigan. After Simplon's failure for almost two years to comply with these requirements, the State of Michigan sent a notice to Johnson informing him that Simplon Corporation's charter would be revoked and would become void as of May 15, 1959. Sometime in 1959, the State of Michigan sent Johnson a notice that it had revoked Simplon Corporation's charter for failure to file annual reports and pay franchise taxes since 1957. [4] After Simplon Corporation's charter was revoked in 1959, Johnson never attempted to file late annual reports for Simplon or to pay arrearage due the State of Michigan because of Simplon's failure to pay corporate franchise taxes. *641 For about a ten-year period from 1958 through 1968, Johnson worked unusually long hours and worked alone developing industrial hoses. He also did side jobs repairing vacuum cleaners in order to make ends meet. During the period from about 1957 through 1971, the business operated by Johnson: (1) had no shareholder or board of directors meetings; (2) had no shareholder elections of a board of directors; (3) had no recorded board minutes; and (4) paid no dividends to any shareholders. At all times between 1956 and the date of trial, Johnson did not undertake any affirmative acts which would allow any of the Simplon shareholders to exercise any of their rights as shareholders, including the right to elect individuals to the Board of Directors, to attend shareholder meetings, or to have any voice in the management of the business. After about 1956 and until Simplon's corporate charter was revoked in 1959, Johnson ran the business without any significant input from other shareholders. After Simplon's corporate charter was revoked, Johnson continued to operate the business in exactly the same manner as he had from 1956 through May 15, 1959. Johnson naver advised any of the Simplon *642 shareholders that Simplon's corporate charter had been revoked on May 15, 1959. Between 1954 and 1975, a few disgruntled Simplon shareholders approached Johnson seeking some return on their individual investments. By January 1, 1976, Johnson had fully paid off only two Simplon shareholders and had partially paid off one or two others. The vast majority of Simplon shareholders never approached Johnson since they had abandoned their shares and all interest in Simplon Corporation. Moreover, Johnson did not pay Simplon shareholders voluntarily. He did not attempt to contact, placate, or pay off those shareholders who did not approach him seeking some return on their investment. On the few occasions that Johnson bought back Simplon shares, he paid only the par value of the shares and did not negotiate a price which took account of factors such as current or retained earnings of the business, the book value of corporate assets, or the replacement value of such assets. Sometime during 1968 or the first half of 1969, Johnson decided to change the name of the industrial hose business from Simplon to "Johnson Products" or "F.R. Johnson Products Company." On June 10, 1969, Johnson, his *643 daughter Mary P. Johnson, his son Roy Johnson, and his secretary Willa D. Bogert executed a certificate of conducting business under the assumed name of "F.R. Johnson Products" under Michigan law. On June 19, 1969, the completed certificate was filed with the State of Michigan, County of Wayne. Johnson did not advise or inform any Simplon shareholders of his intent to change the name of the hose business either before or after June of 1969. Sometime prior to May of 1974, Johnson's secretary Willa Bogert quit working for the business. Thereafter, on May 13, 1974, Johnson and his children (Roy Johnson, Mary Johnson Vertrees, Linda Johnson, and Kay Johnson Creutzburg) executed a second Michigan assumed name certificate under the name "F.R. Johnson Products" in order to remove Bogert's name and to add the names of two more of his children. The second assumed name certificate was filed with the State of Michigan, County of Wayne, on June 21, 1974. This filing occurred after respondent commenced its audit in this case in April of 1974. On May 20, 1975, Johnson, Roy Johnson, Mary Johnson Vertrees, Linda Johnson, and Kay Johnson Creutzburg, as incorporators, executed Articles of *644 Incorporation for F.R. Johnson Products Company under Michigan law. This occurred over a year after respondent had commenced his audit. On June 17, 1975, the incorporators filed the Articles of Incorporation with the State of Michigan, Department of Commerce. The corporate purposes were described as the design, development, manufacture, and sale of vinyl hoses; the capital stock was described as 1,000 shares of common stock at a par value of $ 10 per share. Thereafter, on March 6, 1978, Johnson filed with the Michigan Department of Commerce a completed annual report for F.R. Johnson Products Company for the year 1976. That report listed Johnson and his four children as both the officers and directors of the corporation. After each assumed name filing and after the incorporation of F.R. Johnson Products Company, Johnson continued to operate the industrial hose business in essentially the same manner as he had since at least 1968 or 1969. Johnson continued to be the primary if not the sole developer of the industrial hoses. He kept the same business address and phone number, customers, and creditors. F.R. Johnson Products Company never issued any shares of stock or paid any *645 dividends to shareholders from 1969 throughout the years in question. Sometime during 1972, Johnson appointed a "Board of Directors" of F.R. Johnson Products Company and claimed that that body helped him run the business. However, the members of that group were Johnson's children, his daughter-in-law, and son-in-law. None of these individuals were elected by any shareholders. The record does not show the extent to which, if any, this body participated in the operation of the business, but it does show (1) that the body apparently began to hold meetings of some type in 1969, and (2) that Johnson started to pay the members for their participation in and travel to such meetings in 1972. After Johnson changed the name of the industrial hose business, he used the names "F.R. Johnson Products Company" and "Johnson Products Company" interchangeably on various business documents until at least 1977. He used the name "Johnson Products Company" on printed business stationery, checks, and envelopes and in correspondence with respondent, creditors, and this Court. Johnson used the name "F.R. Johnson Products Company" on printed business stationery and envelopes, postage labels, invoices, *646 and in correspondence with respondent. However, the record does not show the specific time periods during which these latter documents were used. During the years 1972 through 1975, F.R. Johnson Products Company paid many of its creditors, customers, and suppliers by checks drawn on a business checking account labeled "Johnson Products." Others were paid in cash. Johnson also paid some of his personal, nonbusiness expenses by checks drawn on this business account and has agreed to respondent's disallowance of the deductions that he claimed for such expenditures. On at least two separate occasions after the audit began and after the first statutory notices were issued, Johnson Products paid shareholders of Simplon Corporation for their shares. Howard Stein, Sr., purchased 1,000 shares of Simplon common stock at a cost of $ 10,000 which included 470 shares of such stock issued on December 31, 1962. In a letter dated March 7, 1977, Johnson promised to repurchase these shares and to pay interest. [5] Johnson Products began to repay Stein for his Simplon stock during 1977. However, to date Stein has received from Johnson Products or Johnson only between $ 1,000 and $ 3,000 without *647 interest. During the 1960's, Johnson was a customer of Leonard Studzinski's hardware store and established credit there in his individual capacity. After Johnson was unable to pay for purchases totaling $ 1,000 made on credit from Studzinski, Johnson suggested that Mr. Studzinski accept Simplon Corporation stock in lieu of payment. This was the first time Studzinski had ever heard of the Simplon Corporation. Studzinski agreed to accept the Simplon stock in lieu of payment, and received a certificate for 100 shares of Simplon common stock dated July 12, 1962, several years after Simplon Corporation's charter had been revoked. By separate $ 500 checks dated July 30 and October 22, 1976, Johnson Products paid Studzinski $ 1,000 without interest in exchange for his Simplon stock. After the business was incorporated in June of 1975, Johnson Products contracted on October 6, 1975, to purchase from Sam Bailo some land in Salem Township, *648 Washtenaw County, Michigan, that Johnson had rented since the fall of 1974. Johnson signed the sales contract as President of Johnson Products and signed a settlement statement for the property on October 15, 1975. An insurance policy was issued to Johnson Products as the insured party in connection with the sale. Earlier, on March 31, 1975, the Township of Salem had filed a complaint against Johnson and Bailo individually that was apparently related to this land. That lawsuit took place in the Circuit Court for the County of Washtenaw through November 27, 1978, the date on which that case was appealed. In other litigation involving that land in Salem Township and other matters, Johnson on three different occasions made judicial admissions that he was doing business as an individual rather than as a corporation. On March 16, 1977, Johnson, as an individual, filed a complaint against the Township of Salem in the Circuit Court, stating that he was the owner of the property and alleging that he was using the property for a commercial purpose. He stated that he sought a conditional use permit from the Township allowing him to use the property for manufacturing purposes. In that *649 case, captioned "Fred R. Johnson, Plaintiff, vs. Township of Salem, Defendant," Johnson alleged that the Township's zoning laws and actions violated his constitutional rights. Johnson sought a temporary restraining order in the suit preventing the Township from disrupting his business. On June 21, 1977, Frank J. and Juanita M. Tittiger filed an unrelated complaint against Johnson, Individually and Johnson d/b/a Johnson Products as defendant. The complaint alleged that Johnson did business under the name of "Johnson Products." Johnson's answer to that allegation was "No Contest." On December 19, 1977, Johnson filed a sworn affidavit in the Circuit Court of Washtenaw County wherein he alleged that he was purchasing certain land in Salem County of a land contract and that his use of that property constituted a valid, prior non-conforming use that was not in violation of local zoning law. As indicated above, the caption of that case was in Johnson's name individually and not in the name of corporation. Johnson filed corporate Federal income tax returns, Forms 1120, in the name of Simplon Corporation for the years 1954 through 1970. The only Simplon returns in evidence, those *650 for the years 1967 - 1970, stated that Johnson owned 75 percent of the common stock of the corporation. Johnson also filed individual Federal income tax returns for the years 1954 through 1975. Even after Johnson changed the name of the industrial hose business to F.R. Johnson Products Company in June of 1969, corporate tax returns for the business were still filed in the name of Simplon Corporation for the years 1969 and 1970. From 1971 through 1975, inclusive, Johnson filed corporate tax returns for the business in the name of Johnson Products. The returns for 1971 through 1973 stated that Johnson owned 75 percent of the common stock of the corporation. The returns for 1974 and 1975 omitted any information as to stock ownership of the corporate officers. The return for 1975 described the entity as a Small Business Corporation. None of the corporate returns for the years 1971 through 1975 listed any "Compensation of officers" except that paid to Johnson. The corporate returns filed for the business for 1974 and 1975 did not list any compensation of officers, but Forms W-2 attached to Johnson's individual returns for those years showed that Johnson Products paid him a salary *651 of $ 10,400 in each year, and an additional $ 2,060 for 1975 as income from a Small Business Corporation.Johnson's salary from Johnson Products was the principal item of income that he reported on his individual tax returns for each of the years 1972 through 1975. Respondent issued statutory notices of deficiency to Johnson on April 9, 1976, and December 21, 1979. In those notices, respondent determined that Johnson should have reported all income from Johnson Products on his individual returns for the years 1972 through 1975. Statutory notices were also issued to Johnson Products on March 10, 1976, and December 21, 1979, in which respondent determined increases in the income of the business based on a change of Johnson Products' method of accounting and the disallowance of numerous business deductions for each of the years 1972 through 1975. The statutory notices are in the alternative, and the income from the industrial hose business is t be taxed to Johnson individually or to the corporation, but not to both. In 1973, Johnson decided to form an insurance company to provide insurance coverage for Johnson Products and its employees. Johnson started the business with $ 10,000 *652 that he had accumulated from his personal savings and wages. On October 15, 1973, Johnson and his children (Kay Johnson Creutzburg, Linda Johnson, Roy Johnson, and Mary Johnson Vertrees) executed a certificate of conducting business under the assumed name of "Johnson Products Insurance Company" under Michigan law. On October 18, 1973, the completed certificate was filed with the State of Michigan, County of Wayne. Although members of Johnson's family executed the assumed name certificate, none of them ever held any ownership interest in the business and Johnson was at all times the sole owner and president of this business. On June 17, 1975, Johnson executed Articles of Incorporation under Michigan law for a business in the name of "F.R. Johnson Insurance Agency, Inc." (hereinafter the insurance company). Johnson was the sole incorporator of the business. On October 13, 1975, the F.R. Johnson Insurance Agency, Inc., was incorporated under the laws of the State of Michigan. The articles filed with the Department of Commerce provided that the purpose of the insurance company was to provide: (1) hospitalization and workmen's compensation benefits for employees of Johnson Products; *653 (2) fire and theft loss coverage for equipment and property of Johnson Products; and (3) liability and accident protection for trucks, automobiles, and trailers belonging to Johnson Products. Although the articles provided for 1,000 total authorized shares of common stock at a par value of $ 10 per share, the insurance company never issued any shares of stock during its existence. Throughout the years in question, the insurance company allegedly never had any profits, and Johnson never filed any Federal income tax returns with respect to this business. During its entire existence, the insurance company was never licensed by the State of Michigan to engage in the insurance business.Possibly as late as 1977, Johnson made an inquiry to the State of Michigan Insurance Bureau regarding the requirements to license and legally conduct an insurance business in the State of Michigan. Johnson was told that, in addition to other requirements, he had to maintain a cash reserve in the amount of at least $ 1,500,000. After considering the requirements of the Insurance Code, Johnson did not attempt to accumulate the necessary cash reserve or to comply otherwise with the requirements of the *654 Insurance Code to conduct an insurance business in Michigan. Furthermore, after Johnson incorporated the insurance company in 1975, he did not file annual reports or pay corporate franchise taxes to the State of Michigan for any of the years pertinent to these cases. During February of 1980, the State of Michigan sent a notice to Johnson informing him that the insurance company's corporate charter would be revoked on May 15, 1980, for failure to file any annual reports and pay any franchise taxes since the date of the company's incorporation. Shortly thereafter, Johnson was notified that the State of Michigan had revoked the insurance company's corporate charter on May 15, 1980.After the insurance company's corporate charter was revoked, Johnson never attempted to pay the arrearage due the State of Michigan because of the company's failure to pay corporate franchise taxes. Johnson operated the insurance company in exactly the same manner both before and after it was incorporated in 1975. Sometime during the years in issue, Johnson issued a "Hospitalization Insurance Plan" and "Safety Equipment Plan" applicable only to qualified employees of Johnson Products. The plan defined *655 a qualified employee as a person employed full time and on the payroll a total of six months for the hospitalization program and three months for the safety equipment program. The plan primarily provided that the company would cover the first $ 100 of certain enumerated medical services and would thereafter pay one-half the cost of actual charges for such services that were not covered by another insurance plan. Before the company would pay any amount in excess of the $ 100, however, the employee would have had to accumulate the needed amount in his own "fund" made up of contributions of "credits" that he was required to make each month. The plan required an employee to contribute specified sums for credits each month for himself and additional amounts for his spouse and legal dependents. The plan further allowed the employee to draw up to his or her accumulated monthly credits to date for hospital care and safety equipment. The plan also set up separate allowances for safety equipment. During the years in question, Johnson issued one-page "policies" from the insurance company stating that the company agreed to cover: (1) medical needs for Johnson Products' employees; (2) workmen's *656 compensation for Johnson Products' employees; (3) losses from forgery of Johnson Products' checks; and (4) losses from fire and theft of property and equipment belonging to Johnson Products. These documents were signed by Johnson and recited that the specific coverages were for a certain annual period and were for a certain annual or monthly rate. From 1973 through 1975; the insurance company's only asset was a savings and checking account at Security Bank and Trust Company, Southgate, Michigan. Only Johnson and Kay Johnson Creutzburg were authorized to and did disburse funds from the account. At one time, money was borrowed from the insurance account to purchase a fork lift for use in the hose business operations. In addition, Johnson made withdrawals from this account for personal reasons. Throughout these years, the only source of revenue to the insurance company was interest on the savings account and deposits made by Johnson Products. Johnson Products made deposits to Johnson's personal savings account during this period. On the Johnson Products" tax returns, Johnson deducted these deposits to Johnson's personal savings account as payments of insurance premiums. *657 In support of those claimed deductions, Johnson submitted copies of checks and check stubs drawn on the insurance company's account at Security Bank and Trust Company during the years 1973 through 1975. Those printed checks, in numbered sequence from 1001 to 1021 for the period from November 19, 1973 through December 8, 1975, totaled $ 2,896.54. The record does not show how or when these amounts were transferred from Johnson's personal savings account to the insurance company's checking account. The checks were payable to a numer of individuals and the stubs bore notations that the amounts were paid for medical services and safety equipment for such individuals. At the trial, Johnson contended that these amounts represented payments by the insurance company of claims submitted by Johnson Products' employees. Johnson estimated that the average total of payments on such claims for each of the years 1973 through 1975 was $ 2,000. The canceled checks for such claims for all three years totaled just slightly over $ 2,000. The record is silent as to any other insurance coaims for any of the other types of coverage allegedly provided by the insurance company. The amounts deducted *658 by Johnson Products as insurance premiums for the years 1973, 1974, and 1975 were $ 21,289.40, 18,892.95, and $ 47,598.84, respectively. In statutory notices issued to Johnson Products, respondent determined that Johnson Products was not entitled to claimed deductions for insurance expenses on the grounds that they were not an ordinary and necessary business expense under section 162, were not spent for insurance purposes, and were not substantiated. OPINION The first question for decision is whether the income from the industrial hose business for the years 1972 through 1975 should be taxed to Fred R. Johnson individually or to the F.R. Johnson Products Company as a corporation. Petitioners argue that Johnson Products and Simplon Corporation are the same business entity; that Johnson operated the hose business in exactly the same manner both before and after Simplon's charter was revoked in 1959; that Johnson Products was a defacto corporation under Michigan law and an association as defined in section 7701; and that Johnson Products should therefore be taxed as a corporation for the years before the Court. Respondent contends that Johnson Products and Simplon *659 Corporation are separate entities; that Johnson conducted the hose business as a sole proprietorship at all times after Simplon's corporate charter was revoked in 1959; that Johnson Products was neither a defacto corporation under Michigan law nor an association taxable as a corporation; and that all income from the hose business should thus be taxed to Johnson individually for the years 1972 through 1975. Whether an organization is to be taxed as a corporation under the Code is determined by Federal and not state law. Burk-Waggoner Oil Ass'n. v. Hopkins,269 U.S. 110 (1925). Section 7701(a)(3) provides that "the term 'corporation' includes associations, * * *." Section 301.7701-1(b), Proced. & Admin. Regs., states that the Code prescribes the categories or classes into which various organizations fall for purposes of taxation and also establishes the standards that are to be applied in determining the classification of such organizations. The standards for determining whether an organization is an association taxable as a corporation are set forth in section 301.7701-2, Proced. & Admin. Regs. An unincorporated organization will be classified as a corporation *660 for Federal tax purposes if it has more corporate characteristics than noncorporate characteristics, excluding those traits common to both types of organizations. The major corporate characteristics are: (1) associates; (2) an objective to carry on business and divide the gains therefrom; (3) continuity of life; (4) centralization of management; (5) limited liability; and (6) free transferability of interests. Morrissey v. Commissioner,296 U.S. 344 (1935); Secs. 301.7701-2(a)(1) and 2(a)(3), Proced. & Admin. Regs. Although local law does not control the classification of an organization for Federal tax purposes, it does govern the determination of whether the legal relationships that have been established on formation of the organization are such that the Federal standards are met. Thus, local law determines (1) the legal relationships of the members of the organization among themselves and with the public and (2) the interests of those members in the organization's assets. Sec. 301.7701-1(c), Proced. & Admin. Regs. Accordingly we will first examine the status of the business under local law. On August 9, 1954, Johnson and his original partner Cook validly *661 incorporated Simplon Corporation under Michigan law by filing Articles of Incorporation for the business with the State of Michigan Department of Commerce. See MICH. COMP. LAWS § 450.5 (MICH. STAT. ANN. § 21.5 (Callaghan 1963)). From 1954 through 1956, Simplon Corporation observed the corporate formalities, and paid all corporate franchise taxes and filed all annual reports required by the State of Michigan. For the years 1957 and thereafter, however, Simplon failed to pay any franchise taxes to and to file annual reports with the State of Michigan.On May 15, 1959, the State of Michigan revoked Simplon Corporation's charter for failure to pay franchise taxes and file annual reports for two consecutive years pursuant to section 21.91 of Michigan's General Corporation Act. [6] Under that state law, the charter of the corporation was "absolutely void" thereafter, except for the limited purpose of winding up the affairs of the corporation. *662 After Simplon's corporate charter was revoked, Johnson never attempted either to wind up or to revive Simplon's corporate existence under Michigan law. Johnson never requested any extension of time for filing annual reports and payment of franchise fees as provided in section 21.91 of Michigan's General Corporation Act. See footnote 6. Rather than winding up Simplon's affairs and at least prolonging its corporate existence for such limited purposes for three years under section 21.75 of Michigan's General Corporation Act, [7] Johnson continued to operate the hose business in exactly the same manner as he had from 1656 through May 15, 1959. Moreover, Johnson never attempted to revive Simplon's corporate charter by filing late annual reports and paying the arrearage resulting from failure to pay corporate franchise taxes as provided by sections 21.248(1) and 21.248(2) of Michigan's Corporate Fees and Reports Act. [8] See Skarda v. Commissioner,27 T.C. 137 (1956), affd. 250 F. 2d 429 (10th Cir. 1957). Simplon's corporate existence under Michigan law therefore ended on May 15, 1959. *663 Petitioners argue that at all times after Simplon's existence as a dejure corporation ended in 1959, the industrial hose business constituted a defacto corporation under Michigan law. In order for a business entity to be classified as a defacto corporation under Michigan law, that entity must satisfy three requirements: (1) a charter or statute under which a corporation with the powers assumed might have been organized; (2) a bona fide attempt to organize a corporation under such charter or statute; and (3) an actual use of the corporate powers. Newcomb-Endicott Co. v. Fee,167 Mich. 574, 133 N.W. 540 (1911). See also, Tisch Auto Supply Commpany v. Nelson,222 Mich. 196, 192 N.W. 600 (1923); Eaton v. Walker,76 Mich. 579, 43 N.W. 638 (1889). At all times relevant to this case, there existed Michigan statutes under which a corporation with the powers assumed might have been organized: for the years 1959 through 1972, Michigan's General Corporation Act, § 21.1, etseq.;[9] and for the years 1973 through 1975, Michigan's Business Corporation Act, § 21.200(101), [10]etseq. Thus, the first *664 requirement is met. After Simplon's corporate charter was revoked in 1959, however, Johnson never made any bona fide attempt to organize a corporation under either statute until June 17, 1975, when he filed Articles of Incorporation for Johnson Products. To have a defacto corporation, there must be an attempt to perfect an organization under the state law. See Frentz v. Commissioner,44 T.C. 485, 489 (1965), affd. 375 F. 2d 662 (6th Cir. 1967). [11] There was never any such attempt after Simplon's charter was revoked in 1959 until June of 1975. Petitioners argue that Johnson's incorporation of Simplon in 1954 constituted such a bona fide attempt and that Simplon (and later Johnson Products) was a defacto corporation after 1959, because (1) Johnson never learned that Simplon's charter was revoked and (2) he continued to operate the business as a *665 corporation after 1959. Petitioners' argument is contrary to the facts and is without merit. The State of Michigan twice notified Johnson concerning its revocation of Simplon's corporate charter, both before and after May 15, 1959. In 1958, Johnson told one of the former Simplon stockholders that the hose business was his own business and was not the business of Simplon Corporation. In April of 1974, Johnson told the revenue agent examining his case that he had failed to pay the franchise taxes for Simplon Corporation after 1958 and that the only reason he filed corporate tax returns for his business after 1959 was that the Internal Revenue Service kept sending those forms to him. [12] Moreover, Johnson had not operated his industrial hose business as a corporation since 1956, and he did not do so at any time after 1959. Throughout that entire period, Johnson owned and operated the business by and for himself. The industrial hose business therefore did not constitute a defacto corporation under Michigan law from 1959 until June 17, 1975. *666 Having decided that the hose business was neither a dejure nor defacto corporation under Michigan law from 1959 through June 17, 1975, we next address petitioners' argument that the business was an association taxable as a corporation. An organization that has had its corporate charter revoked by the state and that does not constitute a defacto corporation under state law may, in an appropriate factual situation, qualify as an association taxable as a corporation for Federal tax purposes. Messer v. Commissioner,438 F. 2d 774 (3d Cir.1971), affg. 52 T.C. 440 (1969); Ochs v. United States,158 Ct. Cl. 115, 305 F. 2d 844 (1962), cert. denied 372 U.S. 968 (1963); Rockwood v. United States, 69 Ct, Cl. 288, 38 F. 2d 707 (1930); Coast Carton Co. v. Commissioner,10 T.C. 894 (1948). Based on the standards in section 7701(a)(3) and the regulations thereunder, the hose business did not constitute an association at any time after the revocation of Simplon's charter in 1959. As sole owner and operator of the business, Johnson had an objective to carry on business, but *667 he did not conduct that business for joint profit or with the assistance of associates. However, the absence of these factors would not necessarily preclude classification of Johnson Products as an association, if that business could otherwise qualify as a one-man association or one-man corporation. Sec. 301.7701-2(a)(2), Proced. & Admin. Regs. [13]
Johnson has never suggested that he was operating as a one-man corporation or as a one-man assocation. On the contrary, *668 he continues to insist that the shareholders of Simplon Corporation are still shareholders or associates of Johnson Products and that he has never owned more than 25 percent of the shares of Simplon Corporation or Johnson Products. However, the facts are to the contrary, and show that the hose business was owned and operated solely by Johnson from 1959 through 1975. For that reason, we will consider whether or not Johnson Products can be considered as a one-man association. We will therefore determine whether the hose business possessed the remaining characteristics of an association: (1) continuity of life; (2) centralization of management; (3) limited liability; and (4) free transferability of interests. Petitioners have failed to establish (1) that the death, retirement, or resignation of Johnson would not have caused the dissolution of the hose business and (2) that Johnson ever exercised centralized and representative management on behalf of any other members of the business as required by sections 301.7701-2(b) and 2(c), Proced. & Admin. Regs. See Coast Carton Co. v. Commissioner,supra,10 T.C. at 902-905. Petitioners have not shown the extent to *669 which, if any, Johnson's family participated in the operation of the business. Johnson has nvever suggested, and the record does not show, that his children ever owned any shares of Simplon Corporation or ever owned any part of the hose business. Nor does the record show that Johnson's family had the ability and skills necessary to carry on the business without Johnson. Moreover, Johnson testified at the trial that the business could not have made hoses and would not have been successful without him. Despite Johnson's testimony that Johnson Products would "keep on going" in the event of his death, that is simply unsupported and self-serving speculation. There are no facts in the record that would permit us to conclude that the hose business possessed continuity of life at any time prior to the incorporation of the business in 1975. Neither did the hose business possess limited liability from 1959 through 1975 as required by section 301.7701-2(d), Proced. & Admin. Regs. During the two years that Johnson failed to file annual reports and pay franchise fees for Simplon Corporation from 1957 through May 15, 1959, Johson was personally liable for all corporate debts contracted *670 during that period pursuant to section 21.87 of Michigan's General Corporation Act. [14] From the time Simplon's charter was revoked in 1959 through 1975, Johnson was the sole owner and operator of the hose business and was the only person creditors could sue in connection with the hose business. Finally, the hose business did not have free transferability of interests after Simplon's charter was revoked in 1959. Johnson issued shares of Simplon stock after 1959 only in connection with a few isolated personal transactions. Most Simplon shareholders had abandoned their shares and all interest in Simplon Corporation by 1959 and some had claimed income tax deductions for their worthless Simplon stock by that time. At all times relevant to this case, Johnson's stock holdings in Simplon Corporation constituted 20 to 25 percent of the total number of shares.In trying to limit his liability for taxes with respect to Johnson Products, he still argues that his stock in Simplon Corporation never exceeded that percentage. The record as a whole shows that after Simplon Corporation's charter was revoked by *671 the State of Michigan in 1959, Johnson alone carried on the business. He spent about a ten-year period just experimenting with and developing various types of industrial hoses. By the time he filed an assumed name certificate for Johnson Products in 1969, Johnson, and Johnson alone, was the business. Johnson Products never issued by shares of stock. On the Johnson Products' tax returns, signed by Johnson, his stock ownership in the hose business was listed as 75 percent of the common stock. However, there is no indication that anyone else had any interest in Johnson Products then or later. To suggest, as petitioners do, that Simplon Corporation shareholders somehow continued to be shareholders of Johnson Products is sheer sophistry and wholly without factual basis. Johnson's testimony that in the event of his death his stock in Johnson Products "would go to my youngsters" is simply a legal conclusion on his part. There are no facts in the record that would permit us to conclude that the hose business possessed free transferability of interests from 1959 until 1975. In addition to lacking the characteristics of associations as detailed in the regulations, the industrial hose *672 business was not conducted in a corporate manner at any time after 1957. from 1957 through 1971, the hose business had no shareholder or board of directors meetings, no shareholder elections of a board of directors, no recorded board minutes, and no dividends issued to shareholders.From 1972 through 1975, Johnson Products never issued any shares of stock or paid any dividends to shareholders. Moreover, the corporate tax returns filed by Johnson from 1959 through 1975 do not establish that the business was a corporation, for Johnson in 1974 told the revenue agent examining his case that the only reason he kept filing Forms 1120 for his business was that the Internal Revenue Service kept mailing them to him. See footnote 12, above. Accordingly, we hold that Johnson Products was not an association taxable as a corporation for most of the period here involved, from 1972 through June 17, 1975, but was a sole proprietorship, the income of which is taxable to Johnson individually as sole owner. Coast Carton Co. v. Commissioner,supra;Knoxville Truck Sales & Service, Inc. v. Commissioner,10 T.C. 616 (1948). On June 17, 1975, Johnson filed Articles *673 of Incorporation for Johnson Products with the State of Michigan Department of Commerce. Section 21.200(221) of Michigan's Business Corporation Act provides that: The corporate existence shall begin on the effective date of the articles of incorporation as provided in section 131. Filing is conclusive evidence that all conditions precedent required to be performed under this act have been fulfilled and that the corporation has been organized under this act, * * *.[15]
Section 21.200(131)(2) of that Act specifies that articles of incorporation are generally effective at the time they are endorsed. [16] Johnson clearly complied with the conditions precedent to the creation of a corporation under Michigan law when the articles for Johnson Products were filed and endorsed on June 17, 1975. Once a taxpayer has complied with state laws governing the creation of a corporation, a separate entity comes into being, be it dejure or defacto, which will not be *674 ignored for Federal tax purposes so long as its creation is followed by business activity other than tax avoidance. Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). Any statutory conditions under state law that relate to the right to engage in business and that are to be performed after the corporation has been formed are conditions subsequent. Although non-compliance with those conditions subsequent may give the state the right to proceed to forfeit the corporate charter, such non-compliance does not in any way affect the legal existence of the corporation absent such state action. Moline Properties, Inc. v. Commissioner,supra;Carver v. United States,188 Ct. Cl. 202, 412 F. 2d 233 (1969); Skarda v. Commissioner,supra at 433-435; Strong v. Commissioner,66 T.C. 12 (1976), affd. by order 533 F. 2d 94 (2d Cir. 1977). Although there are facts pointing in both directions, we conclude that a separate legal entity was created on June 17, 1975, and that that entity did carry on some business activity thereafter. After Johnson Products was incorporated on June 17, 1975, Johnson *675 continued to conduct his business activities in exactly the same manner as before the incorporation. However, we cannot say that Johnson Products did not carry on some business activity after its incorporation. Moreover, we find that the business activity so engaged in was something other than mere tax avoidance activities. On October 6, 1975, Johnson Products contracted to purchase some land in Salem Township in its own name and received an insurance policy on that property in its own name.See Morrissey v. Commissioner,supra;Strong v. Commissioner,supra at 24-25. Johnson's individual actions in regard to the purchase of that property by the corporation and his various judicial admissions made in connection with litigation involving that property strongly suggest that he individually, and not the corporation, purchased the land and that he individually, and not the corporation, was carrying on the hose business. We need not recite all the details set out in the findings of fact. We have concluded that Johnson was carrying on the business in his individual capacity up to the date of incorporation in 1975. Johnson's actions in the subsequent *676 litigation were ambiguous to say the least and could be interpreted to suggest that the hose business was not held out to the public as a corporation. While the matter is not free of doubt, we conclude that the newly formed corporation did carry on some business activity after June 17, 1975, and at least until the end of 1975. Any subsequent failure to comply with Michigan laws requiring the payment of franchise taxes and the filing of annual reports and any failure to use the corporate name in lawsuits relating to the business (1) occurred only after December 31, 1975, (2) constituted conditions subsequent to the incorporaton of Johnson Products, and (3) had no affect on its existence as a valid corporation through December 31, 1975. Accordingly, we hold that Johnson Products was taxable as a corporation from June 17, 1975 through December 31, 1975, and was requied to file a corporate tax return only for that portion of the year during which it was in existence and not for the entire year. Sec. 6012(a)(2); Sec. 1.6012-2(a)(2), Income Tax Regs.
Havig held that the income from the industrial hose business is taxable to Johnson from 1972 through June 17, 1975, and to Johnson *677 Products from June 17, 1975 through December 31, 1975, we must next decide whether each respective taxpayer is entitled under section 162 to deduct for the years 1973 through 1975 certain "payments" made to F. R. Johnson Insurance Agency, Inc., as insurance premiums. Petitioners argue that amounts were paid to the insurance company and are deductible insurance premiums to cover hospitalization and workmen's compensation benefits for employees of Johnson Products, fire and theft loss coverage for equipment and property of Johnson Products, coverage of losses due to forgery of Johnson Products' checks, and liability and accident protection for trucks, automobiles, and trailers belonging to Johnson Products. Respondent contends that such amounts were not "expenses" of the hose business but constituted funds set aside as a reserve against anticipated future liabilities.Respondent further argues that since those amounts were reserves, they involved no risk-shifting and were not insurance premiums deductible under section 162. Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section *678 1.162-1(a), Income Tax Regs., provides that deductible business expenses include "insurance premiums against fire, storm, theft, accident, or other similar losses in the case of a business." Deductions are a metter of legislative grace and petitioners have the burden of proving their entitlement to the claimed deductions for insurance premiums. New Colonial Ice Co. v. Helvering,292 U.S. 453, 440 (1934); Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Reserves to cover contingent losses that are set up for self-insurance and are equal to the estimated premiums payable to an insurer are not deductible under section 162.In Pan-American Hide Co. v. Commissioner,1 B.T.A. 1249 (1925), we held that such a reserve was not a deductible insurance premium and stated at p. 1250 that: The taxpayer also urges that it is improper to discriminate between one who pays premiums to an insurer and one who bears his own risk. The difference is one of fact; in the one case the expense of premiums is paid or incurred and in the other it is not. The discrimination, if such it be, is self-imposed. *679 Since the statute does not permit a taxpayer to deduct as an expense an amount which he fears he may some day be called upon to spend, there can be no sanction for such a deduction. Risk shifting or risk distribution is thus one of the requisites of a true insurance contract. It follows that a taxpayer incurs deductible expenses for insurance premiums only to the extent he has shifted the risk of loss away from himself as insured and to a third party as insurer, and that deductions are not allowed for sums set aside for self-insurance. Helvering v. LeGierse,312 U.S. 531 (1941); Steere Tank Lines, Inc. v. United States,577 F. 2d 279, 280 (5th Cir. 1978), cert. denied 440 U.S. 496 (1979); Spring Canyon Coal Co. v. Commissioner,43 F. 2d 78, 79-80 (10th Cir. 1930), cert. denied 284 U.S. 654 (1931); Carnation Co. v. Commissioner,71 T.C. 400 (1978), affd. 640 F. 2d 1010 (9th Cir. 1981). In the present case, it appears that in regard to employee health coverage, the only possible risk shifting was the first $ 100 of coverage for each Johnson Products' employee under the *680 "Hospitalization Insurance Plan." That plan provided that the insurance company would pay the first $ 100 of certain enumerated medical services and would thereafter pay one-half the cost of actual charges for such services that were not covered by another insurance plan. However, the company would pay one-half of such charges only if the employee had already accumulated the needed amount in a fund made up of his own required monthly contributions from his salary. The plan also allowed an employee to make withdrawals from this required reserve up to his or her accumulated monthly credits for hospital care and safety equipment. Thus, under the Hospitalization Insurance Plan, petitioners simply required the individual employees of Johnson Products to pay for their own medical services, except for the first $ 100 of coverage for each employee. Certainly, neither Johnson nor Johnson Products is entitled to a deduction for the employees' own contributions for their own health care.
In support of these claimed deductions, Johnson submitted copies of checks and check stubs drawn on the insurance company's bank account during the years 1973 through 1975. These checks in numbered sequence *681 were payable to several individuals and the stubs bore notations that the amounts were paid for medical services and safety equipment for such individuals. At the trial, Johnson testified that those amounts represented payments by the insurance company of claims submitted by Johnson Products' employees and he estimated that the average total of such payments for each of the years 1973 through 1975 was $ 2,000. Actually, the checks showed payments of only slightly over $ 2,000 for all three years. In any event, the record does not show the extent to which those amounts represented contributions by the employees themselves rather than any deposits by Johnson or Johnson Products.
Any amounts paid for other insurance coverage of Johnson Products and for workmen's compensation benefits were at best reserves for self-insurance rather than deductible insurance premiums. The insurance company was never licensed to engage in the insurance business by the State of Michigan, and Johnson never attempted to accumulate the necessary cash reserve to conduct such a business. The insurance company allegedly never had any profits and it did not file any tax returns during its existence. Quite *682 apart from the legal nature of this entity, the facts show that neither Johnson nor Johnson Products ever paid any insurance premiums. The "payments" deducted by Johnson Products as insurance premiums consisted of deposits made to Johnson's personal savings account. Moreover, some of these deposits may have been employee contributions. The record does not show how and when those deposits were transferred from Johnson's personal savings account to the insurance company's bank account. However, the record does show that Johnson borrowed money from the insurance company's bank account to buy a fork lift for the hose business, and that he made withdrawals from that account for personal reasons. On the above facts, we conclude that the insurance company, at least for the years before the Court, was not an entity separate and distinct from Johnson but was an individual pocket of Johnson that he used in part as a reserve for self-insurance against any anticipated future losses of Johnson Products and the employees and in part as a source of funds for his business and personal expenses. On this record, we also cannot say that that situation changed in any way after Johnson Products and *683 the insurance company were incorporated in June and October of 1975, respectively. Accordingly, we hold that the deposits by Johnson and Johnson Products to the insurance company do not constitute payments of deductible insurance premiums under section 162. While the matter is not entirely clear, petitioners apparently have conceded the negligence additions under section 6653(a). In any event, petitioners have the burden to establish that the underpayment of any tax was not due to negligence or intentional disregard of rules and regulations. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Vaira v. Commissioner,52 T.C. 986, 1004 (1969), affd. 444 F. 2d 770, 777 (3d Cir. 1971). Petitioners have not sustained their burden of proof. To reflect the concessions and holdings herein, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Fred. R. Johnson, dockets Nos. 4786-76 and 17649-79; and Johnson Products Company, docket No. 17650-79.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years here involved. ↩
3. The names "F.R. Johnson Products Company" and "Johnson Products Company" refer to the same entity. The principal issue in these cases is whether or not that entity, by whatever name, is a separate taxable entity from petitioner Fred R. Johnson. Therefore, the reference to either company name is solely for identification and is not determinative of whether or not there is such a separate entity for federal tax purposes.↩
4. Our findings in this paragraph are based on the parties' stipulations of fact. Relying solely on Johnson's testimony, however, petitioners on brief now ask the Court to find as a fact that Johnson never knew that the corporate charter of Simplon Corporation had been revoked by the State of Michigan or that franchise taxes had to be paid. The Court did not believe Johnson's testimony to that effect. Johnson's testimony was self-serving, internally inconsistent, evasive, directly in conflict with the parties' stipulations of fact and mostly stricken at trial on the basis, and unworthy of belief. Petitioners did not ask to be relieved of the stipulations, and in fact asked that all testimony as stricken and that the case be submitted to the Court solely on the parties' stipulations. The Court denied the request and chose to consider the case on the full record.↩
5. The letter did not state whether interest was to run from the date of the letter or from the date of Stein's most recent stock purchase on December 31, 1962. Since no interest was ever paid, any ambiguity in the terms of the letter is irrelevant.↩
6. MICH. COMP. LAWS § 450.91 (MICH. STAT. ANN. § 21.91 (Callaghan 1963)), provides that: Failure to file report and pay fees for two years, charter void; extensions of time.
SEC. 91. If any profit corporation which has heretofore been, is now or may hereafter be required to file its annual report with and pay a privilege fee to the secretary of state, shall for two [2] consecutive years neglect or refuse to file such report and/or to pay such fee, the charter of such corporation shall be absolutely void, without any judicial proceedings whatsoever, and such corporation shall be wound up in any manner provided by this act unless the secretary of state shall for good cause shown extend the time for the filing of such report of the payment of such fee as the case may be. * * *↩
7. MICH. COMP. LAWS § 450.75↩ (MICH. STAT. ANN. § 21.75 (Callaghan 1963)). 8. MICH. COMP. LAWS §§ 450.431 and 450.432↩ (MICH. STAT. ANN. §§ 21.248(1) and 21.248(2) (Callaghan 1963)).
9. MICH. COMP. LAWS § 450.1, etseq. (MICH. STAT. ANN. § 21.1, etseq.↩ (Callaghan 1963)). 10. MICH. COMP. LAWS § 450.1101, etseq. (MICH. STAT. ANN. § 21.200(101), etseq.↩ (Callaghan 1963)).
11. Cf. Bellv. Commissioner,T.C. Memo. 1956-291↩.
12. At the trial, Johnson denied that he had made these statements to the former shareholder and to the revenue agent, but the Court did not find his denials convincing. The Court found the testimony of the former shareholder and the revenue agent to be more credible. See also footnote 4 above.↩
13. Sec. 301. 7701-2(a)(2), Proced. &Admin. Regs., provides in pertinent part: Since associates and an objective to carry on business for joint profit are essential characteristics of all organizations engaged in business for profit (other than the so-called one-man corporation and the sole proprietorship), the absence of either of these essential characteristics will cause an arrangement among co-owners of property for the development of such property for the separate profit of each not to be classified as an association. * * * (Emphasis supplied.) For discussion of one-man associations, see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 2.07, p. 2-23 (4th ed. 1979).↩
14. MICH. COMP. LAWS § 450.87↩ (MICH. STAT. ANN. § 21.87 (Callaghan 1963)).
15. MICH. COMP. LAWS § 450.1221↩ (MICH. STAT. ANN. § 21.200(221) (Callaghan 1974)).
16. MICH. COMP. LAWS § 540.1131↩ (MICH. STAT. ANN. § 21.200(131)(2) (Callaghan 1974)).